UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNIVERSAL IMAGE PRODUCTIONS, INC., a/k/a
UNIVERSAL IMAGE,
        Plaintiff,

v.

        Case No. 06-12805
        Honorable Julian Abele Cook, Jr.
        Magistrate Judge Virginia Morgan

THE CHUBB CORPORATION, CHUBB GROUP OF
INSURANCE COMPANIES, CHUBB & SON, INC.,
New Jersey Corporations; and FEDERAL
INSURANCE COMPANY, an Indiana Corporation,
        Defendants.

## ORDER

In this case, the Plaintiff, Universal Image Productions, Inc. ("Universal"), seeks to obtain damages from the Defendant, Federal Insurance Company ("Federal")[1] on the basis of the parties' insurance policy which covers claims for losses to Universal's commercial property under two theories; namely, breach of contract, and violations of the Uniform Trade Practices Act, Mich. Comp. Laws § 500.2001, et. seq.

On June 24, 2009 and July 30, 2009, Federal filed three motions for the entry of summary judgments relating to Universal's (1) claims which seek damages for its anticipated losses; (2) attempt to recover damages for business interruption, abandoned properties, fixtures, and areas not subject to its lease; and (3) effort to recover for concurrent causes of loss. Universal opposes Federal's motions.

---

[1]In an order that was based upon the parties' stipulation and entered on August 15, 2006, Universal's claims against The Chubb Corporation, Chubb Group of Insurance Companies and Chubb & Son, Inc. were dismissed.

1

I.

In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Under Federal Rule of Civil Procedure 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Here, the burden is on the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In assessing a summary judgment motion, the Court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed. R. Civ. P. 56(c)); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991). It is the responsibility of the Court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

Inasmuch as this is a diversity case, the Court must apply the law of Michigan on the basis of the *Erie* doctrine. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64 (1938). Thus, the Court is obliged to apply the law in accordance with the decisions of the Michigan Supreme Court. *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir.1999). In those situations in which the Michigan Supreme Court has not addressed an issue, a decision by a Michigan appellate court binds this Court "absent a strong showing that the [Michigan Supreme Court] would decide the issue differently." *See Kurczi v. Eli Lily & Co.*, 113 F.3d 1426, 1429 (6th Cir.1997).

Michigan courts apply general rules of contract construction when interpreting insurance policies. *South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635, 653 (1997). When construing a policy, a court must seek to determine if its language is clear and unambiguous on its face. Therefore, if the language within the policy is clear and unambiguous, its terms and words should be enforced by utilizing their plain and commonly understood meaning. *Royal Prop. Group, LLC v. Prime Ins. Syndicate, Inc.,* 267 Mich. App. 708, 714 (2005); *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 206 (1991). Moreover, a court may not create an ambiguity where none exists. *Fire Ins. Exchange v. Diehl*, 450 Mich. 678, 687 (1996).

II.

As a television production firm, Universal works with advertising agencies, editorial houses, and other companies to provide visual effects and production support for their respective endeavors. From 1989 through September of 2002, Universal operated its business on the second and third floors of a three-story commercial building in Southfield, Michigan ("the Building"). Prior to its occupancy, Universal had entered into several agreements with the owner of the Building ("the Landlord"), all of which were memorialized in two freestanding leases with six amendments. Most

relevant to this case is a lease which bore the date of May 6, 1997 ("the Lease") that required Universal to insure its own property.[2] Although Universal occupied portions of the first floor of the Building since February of 2001,[3] it had planned to expand this space for business purposes, as reflected in its "*Sixth Amendment to Lease Agreement*" ("the Sixth Amendment") which became effective on August 7, 2002. In support of its claims in this lawsuit, Universal contends that (1) the projected expansion on the first floor was critical to its growth, and (2) in relying upon the terms under the Sixth Amendment, it had planned to occupy this expanded area on September 1, 2002.

Universal claims that during the second week of August in 2002, and following a very heavy rainfall,[4] a foul odor began to permeate the entire first floor of the Building. When an employee complained about the presence of the odor, Universal's Senior Vice President Patricia Dial confirmed the problem and immediately scheduled air quality testing. On August 20th, she enlisted the aid of Jon Dattilo, a representative from an independent air quality agency, who observed mold and bulkwater inside the duct work of the Building. Thereafter, he characterized the ventilation system as being hazardous and recommended its immediate shutdown. Four days later, Dattilo confirmed the presence of (1) bacterial contamination in the air and (2) water inside the duct work.

Further testing of those areas on the first floor that were occupied by Universal revealed

---

[2] § 13.1 of the Lease requires Universal to insure its "furniture, fittings, installations, alterations, additions, partitions, fixtures and anything in the nature of leasehold improvements."

[3] According to Universal, its 1st floor occupancy included a library, two "profit centers," a training area, and several other spaces that had been extensively renovated.

[4] Federal disputes this characterization, and points to the records from the National Climatic Data Center for August of 2002 which purportedly show that the rainfall within the metropolitan area of Detroit during this time period was minimal.

4

high levels of bacteria in the premises. In response, the Landlord shut down the air handling system, sealed off the air ducts, installed temporary cooling units, and cleaned portions of the ventilation system on the first floor. Notwithstanding these efforts by the Landlord to correct the situation, Universal contends that this cleansing process caused it to suffer a major disruption in its business activities. In its view, these efforts to correct the ventilation system produced an excessive amount of heat, which, in turn, endangered the health and welfare of the employees and adversely affected the operation of its business equipment. On the basis of a laboratory analysis in November 2002 which revealed the continuing presence of bacteria within the Building and acting upon the belief that its property would never be fully restored to its original condition, Universal moved its business to a new and permanent location in March of 2003.

III.

A.

Under its insurance contract with Universal, Federal agreed to pay for "direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded."[5] This is an "all-risk" style of insurance coverage, which means the insured can recover for damage to the insured property regardless of the peril that caused the harm unless a particular peril is specifically excluded. *See generally, Tower Automotive Inc. v. American Protection Ins. Co.,* 266 F. Supp. 2d 664, 667-68 (W.D. Mich 2003). Universal bears the burden of demonstrating that its loss is covered by the Policy. *See generally, Clark v. Hacker*, 345 Mich. 751, 756 (1956).

---

[5] The complete text of the provision is as follows: "We will pay for direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded, not to exceed the applicable Limit Of Insurance for Building or Personal Property shown in the Declarations." (Policy at 3 of 12, Building and Personal Property).

5

Here, Universal argues that a covered peril - namely, water seepage into the Building - caused it to suffer a direct physical loss in the form of pervasive odor, mold and bacterial contamination (both visual and aerosolized), as well as water damage. Although the term "direct physical loss" is not defined in the Policy, at least one Michigan court has examined the causation aspect of this phrase in the context of an insurance contract. *See Acorn Inv. Co. v. Michigan Basic Property Ins. Assn.,* No. 284234, 2009 WL 2952677 at *2 (Mich. App. Sept. 15, 2009) (unpublished) (opining that the word "direct" signals immediate or proximate cause, as distinct from one that is remote or incidental, and concluding in part that extensive flooding caused by acts of vandalism in the removal of piping amounted to a direct physical loss). According to Merriam Webster's Online Dictionary, the term "physical" is defined as something which has a "material existence: perceptible especially through the senses and subject to the laws of nature." Merriam-Webster, available at http://www.merriam-webster.com/ (last visited March 26, 2010).

Federal, in challenging this claim by Universal, argues that neither mold contamination nor the threat thereof constitutes a "direct physical loss" under the express language of the Policy. Both parties agree that neither of them are aware of any reported Michigan or Sixth Circuit case authority which has addressed this precise question. Nevertheless, Federal points to several cases from other jurisdictions which suggest that no physical loss occurs unless a contaminant actually alters the structural integrity of the property. *See generally, Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App.3d 23, 40-41 (2008) (affirming lower court's ruling that dark staining from mold did not constitute "physical loss" where plaintiff's expert testified that mold could be removed from wood surface by bleaching and chemically treating affected areas); *Great Northern Ins. Co. v. Benjamin Franklin Federal Sav. & Loan Ass'n.*, No. 90-35654, 1992 WL 16749, *1 (9th Cir. Jan. 31, 1992)

6

(unpublished) (opining that asbestos contamination represented an economic loss and not a physical loss, inasmuch as the building remained physically unchanged).  Thus, absent material damage to the property, it is Federal's belief that Universal's claims for the presence of mold are *per se* invalid.          In opposing Federal's arguments, Universal notes that courts in other circuits have applied a more liberal standard.  *See, e.g., Columbiaknit, Inc. v. Affiliated FM Ins. Co.,* No. 98-434-HU, 1999 U.S. Dist. LEXIS 11873 at *16-19 (D. Oregon August 4, 1999) (unpublished) (noting that physical damage can be demonstrated by presence of strong pervasive, persistent or noxious odor and denying insurer's motion for summary judgment where the odor stemmed from mold damage caused by the leakage of water and moisture inside  clothing warehouse); *Matzner v. Seaco Ins. Co.*, No. 96-0498-B, 1998 WL 566658, *3 (Mass. Super. Aug. 12, 1998) (finding that carbon monoxide contamination constitutes direct physical loss even though it did not produce tangible damage to the structure of the insured property); *Farmers Ins. Co. v. Trutanich*, 123 Ore. App. 6, 11 (Or. Ct. App. 1993) (denying summary judgment against insured because court deemed subject property to have been physically damaged by noxious odors emanating from methamphetamine laboratory in neighboring apartment unit); *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39 (Colo. 1968) (determining that direct physical loss had occurred after receiving evidence of extensive accumulation of gasoline around and under a church building that rendered premises uninhabitable, even though the fuel was below explosion levels).

After reviewing the authority presented by both parties, the Court finds Federal's argument to be more persuasive.  Universal has not shown that it suffered any structural or any other tangible damage to the insured property.  Rather, the bulk of Universal's argument relies upon proof that it suffered such intangible harms as strong odors and the presence of mold and/or bacteria in the

air and ventilation system within its Building which, in its judgment, rendered the insured premises useless. As the district court noted in *Columbiaknit, supra,* however, even physical damage that occurs at the molecular or microscopic level must be "distinct and demonstrable." *Columbiaknit,* 1999 WL 619100 at *7. Although Universal cites testimony which indicates that the entire first floor of its insured premises had been engulfed by an appalling odor, there is no evidence that this stench was so pervasive as to render the premises uninhabitable. The Court also notes that Universal's own expert, John Dattilo, did not even suggest that the entire premises be vacated. Rather, he merely recommended that (1) the occupants of the first floor wear respirators, (2) the Building owner authorize an immediate shutdown of the ventilation system and (3) a complete remediation of the ventilation system be undertaken. Dattilo also suggested that only one employee (who was infected with bacterial pneumonia) avoid the affected floor. (Plaintiff's Response at 4). This fact - standing alone -distinguishes the current case from *Trutanich* and *Matzner, supra*. *See also, Western Fire Ins. Co. v. First Presbyterian, supra* (observing that the insured premises were rendered uninhabitable by the infiltration of (1) gasoline into the soil beneath the building, and (2) gasoline vapors into building's foundation, halls and rooms, which made use of the building dangerous). Inasmuch as Universal has failed to show that it suffered a direct physical loss under the Policy, Federal is entitled to a summary judgment.

B.

Federal next argues that it is entitled to a summary judgment on Universal's claim that it suffered losses related to the interruption of its business. In its view, Universal cannot recover under the "*Business Income with Extra Expenses*" section of the Policy unless the interruption of its business results from a direct physical loss. In support of its argument, Federal points to policy

8

language which indicates that the insurance company "will pay for **business income** loss [Universal] incur[s] due to the actual impairment of [its] **operations**. . . ." (Policy at 3 of 12, *"Business Income With Extra Expenses"*) (emphasis in original). However, such impairment must "be caused by or result from direct physical loss or damage by a **covered peril** to **property** . . . ." *Id.* Federal also points out that Patricia Dial testified that no mold damage occurred to any of the company's equipment or property.

Federal's analysis here depends entirely on its earlier argument that Universal has not suffered a "direct physical loss." Because the Court, in adopting its above rationale, believes that Universal has failed to establish that such a loss occurred, Federal's request for the entry of a summary judgment on this issue will be granted. *Section IA, supra.*

The remaining portion of Federal's second motion seeks to prevent Universal from recovering payment from damage to (1) the space that it had not yet occupied, (2) property that was discarded during its move to a new building; and (3) any fixtures or permanent improvements to the premises.

As to the first claim, Federal seeks to limit Universal's recovery for space that it had planned to occupy under the Sixth Amendment to the parties' Lease agreement. Federal points to the testimony of Patricia Dial who opined that Universal would not have been ready to occupy the expanded space for a period of six months. In response, Universal notes that not all of its claimed loss of profits are associated with the first floor expansion. Rather, Dial and others maintain that Universal had planned to move important segments of its existing operations into the expansion area. Yet, beyond its excitement about the prospects of the anticipated move, Universal's evidence on this point is entirely speculative. Dial acknowledged that Universal had neither prepared any

9

layout plans for the new area nor undertaken any concrete steps toward developing the space. Inasmuch as Universal presented only a "mere scintilla" of evidence on this point, the Court finds that Federal is also entitled to a summary judgment on this issue.

Federal also asks the Court to place a limitation upon Universal's claim for property that was allegedly abandoned when it moved to the temporary space. In making this statement, Federal relies upon Dial's repeated acknowledgment that Universal had left certain items behind because they could not easily fit into the new space. By contrast, Universal, while acknowledging that none of the challenged items were contaminated by mold or bacteria, submits that these properties became useless because of its forced relocation. The testimony, about which the parties have debated, revolves around Dial's statements that the discarded computers, refrigerator, and other equipment were not sufficiently valuable to be placed in temporary storage along with other equipment. In light of these representations, the Court finds that Universal cannot collect damages for these items.

Federal offers three distinct theories upon which it seeks to preclude Universal from claiming damages for building improvements. Yet, a review of the Policy reveals that the Court need not reach this question because Universal has failed to prove that it suffered a "direct physical loss" which would trigger the protections under the parties' insurance contract. *See,* Policy at 3 of 12, *"Building and Personal Property"* and Policy at 20, 21, 29 and 35 of 36, *"General Provisions"* (setting forth language within the Policy which makes it clear that Federal will cover "direct physical loss" or damage to building or personal property, which by cross-reference includes any fixtures, alterations, installations or additions that Universal makes a part of the Building at its expense, but cannot legally remove).

For similar reasons, the Court need not resolve Federal's challenge to Universal's attempt to claim losses that occurred in newly acquired areas under Universal's Lease. *See* Policy at 3 of 12, "*Newly Acquired Premises*" (noting that Federal "will pay for direct physical loss or damage to . . . building or personal property at newly acquired premises . . . ."). Because this coverage, like other policy provisions, is based on a requirement that Universal experience a direct physical loss to its property, Federal is entitled to a summary judgment on this issue as well.

C.

In its final motion, Federal claims that, inasmuch as Universal's loss stems from at least one excluded cause (e.g., poor maintenance and design, and/or non-covered pollutants), Michigan law operates as a complete bar to recovery since courts typically deny coverage when concurrent causes of loss occur, but one of those causes is excluded under the Policy. *See, Iroquois on the Beach, Inc. v. General Star Indem. Co.*, 550 F.3d 585, 588 (6th Cir. 2008) (observing that Michigan's default rule is that "a loss is *not* covered when it is concurrently caused by the combination of a covered cause and an excluded cause) (emphasis in original); *Vanguard Ins. Co. v. Clarke,* 438 Mich. 463, 468 (1991), *overruled in part on other grounds by Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 664 (2003) ("we perceive no compelling policy rationale to adopt the dual causation theory accepted in other jurisdictions . . . . no sound jurisprudential . . . reason exists to introduce a legal theory or doctrine that departs from the literal interpretation of an unambiguous insurance contract.").[6]

---

[6]Universal asks the Court to apply the minority rule on concurrent causes, which allows recovery when more than one cause of loss exists but one of those causes is excluded. The Court declines this invitation in light of clear precedent from the Michigan Supreme Court which compels the opposite conclusion.

As the insurer, it is Federal's burden to prove that one of the exclusions under the Policy is applicable here. *Heniser v. Frankenmuth Mutual Ins. Co.,* 449 Mich. 155, 161 n.6 (1995). Although Federal's assessment of the concurrent loss rule is correct, a summary judgment cannot be granted on the basis of the facts of this case. First, in suggesting that Universal's claims are prohibited by the "*Defective Maintenance Exclusion*" provisions within the Policy, Federal points to the following language which exempts from coverage any loss or damage

> caused by or resulting from any faulty, inadequate or defective: planning . . . development, surveying, siting; design specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, . . . or maintenance, of part or all of any property on or off the premises shown in the Declarations.

Policy at 7 of 36, "*General Provisions*." Federal cites testimony from Dattilo, who allegedly attributes, in part, the mold and water infiltration to poor maintenance, design and grading of the sub-grade duct work, and poor plumbing. In response, Universal points to the testimony of its engineering expert who testified that (1) there was nothing to suggest that the Building's air handling system had not been properly maintained, (2) he would not characterize the duct work as being faulty as the result of a design, construction or latent defect; and (3) water infiltrated the duct work because of a rising underground water table.

A review of this competing evidence reveals that, unlike the insurance companies in those cases upon which it relies, Federal has not pointed to any uncontested facts which make it clear that the "*Defective Maintenance Exclusion*" provisions should apply. *See, e.g., Iroquois on the Beach, supra* at 586-87 (noting specifically that the parties did not contest the facts underlying the exclusion clause, and that "the record without dispute" established that water damage lasting fourteen days fell within the Policy's exclusion)*; Vanguard, supra* at 468 (granting relief for the insurance company where plaintiff's counsel, in not contesting the facts underlying the excluded

cause, argued erroneously that the case should have been allowed to proceed on both theories); *TMW Enterprises, Inc. v. Federal Ins. Co.,* No. 07-12230, 2009 WL 928227 at *1 (E.D. Mich. Mar. 31, 2009) (noting specifically that it was undisputed that the damage was caused, at least in substantial part, by two concurrent causes: construction defects and water). A fair reading of the testimonies of Dattilo and Universal's engineering expert make it clear that neither person was willing to attribute the claimed loss to defective planning, grading, or maintenance.

Federal also notes that Universal's claims were barred by the "*Pollutant Exclusion*" provision which precludes coverage for "loss or damage caused by or resulting from the mixture of or contact between property and a **pollutant** when such mixture or contact causes the property to be impure and harmful to: (1) itself or other property; (2) persons, animals or plants; [or] (3) land, water or air . . . ." (Policy at 8-9 of 36, "*General Provisions*") (emphasis in original). In turn, "Pollutant" is defined as, among other things, "organisms or microorganisms, including bacteria, fungus, mold or their spores or products . . . ." (Policy at 31 of 36, "*General Provisions*").

As Universal correctly notes, this exclusion does not apply to "water that: (a) backs up or overflows through sewers, drains or sump; [or] (b) seeps or leaks through basements, foundations, roofs, walls, floors or ceilings of any building or other structure . . . ." Although it is of little practical consequence in light of an earlier determination in this case that Universal's damages do not amount to a covered loss, the Court concurs with Universal's conclusion that the exception to the "*Pollutant Exclusion*" applies here. The thrust of Universal's insurance claim is that a covered peril (i.e., water seepage into the Building) caused physical damage in the form of pervasive odor, mold and bacterial contamination (both visible and aerosolized). To this end, Universal's expert opined that the damage was precipitated by water and moisture migration and hydrostatic

13

infiltration, which gave rise to uncontrolled mold growth, emission of microbial spores through the HVAC system, and elevated bacterial levels in the air. Under the Policy's plain language, the exception to the "*Pollutant Exclusion*" applies to water (presumably carrying pollutants) which seeps through basements, foundations, walls or floors. As applied here, it seems clear that this polluted water contaminated the Building's duct work. Thus, under the clear language of the exception, Universal's claims for losses caused by mold damage - if covered - would not be affected by the "*Pollutant Exclusion*." But, inasmuch as the Court has determined that Universal has not suffered a direct physical loss, Federal is ultimately entitled to a summary judgment.

IV.

For the reasons that have been outlined above, Federal's motion for a summary judgment relating to the claims by Universal which seek damages for anticipated losses, as opposed to actual physical losses, is granted. Federal's motion for a summary judgment for business interruption, abandoned property, fixtures and non-leased areas is also granted. Finally, the Court grants Federal's request for the entry of a summary judgment with regard to concurrent causes of loss.

IT IS SO ORDERED.

Dated:   March 29, 2010                   S/Julian Abele Cook, Jr.
    Detroit, Michigan                        JULIAN ABELE COOK, JR.
                                                              United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 29, 2010.

                                                                                   s/ Kay Doaks
                                                                                   Case Manager